ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE PRIMERA INSTANCIA
SALA SUPERIOR DE HUMACAO

| | |
|---|---|
| ADA N. LÓPEZ SANTIAGO ; ÁNGEL LUIS RAMOS TORRES Y LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA ENTRE ELLOS<br><br>Demandantes<br><br>Vs.<br><br>DRA. YOLANDA MOLINARIS GELPI; su esposo de nombre desconocido FULANO DE TAL; LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA ENTRE ELLOS ; SU ASEGURADORA DE NOMBRE DESCONOCIDO X;CENTRO MEDICO DEL TURADO INC. H/N//C HOSPITAL HIMA SAN PABLO DE HUMACAO; SU ASEGURADORA DE NOMBRE DESCONOCIDO Z<br><br>Demandados | CIVIL NUM.<br><br>HSCI201400241 (208)<br><br><br>SOBRE:<br><br>DAÑOS Y PERJUICIO POR MALAPRÁCTICA MÉDICA |

**EMPLAZAMIENTO POR EDICTO**

ESTADOS UNIDOS DE AMÉRICA,           )
EL PRESIDENTE DE LOS ESTADOS UNIDOS,  ) SS.
EL ESTADO LIBRE ASOCIADO DE PUERTO RICO )

A:   DRA. YOLANDA MOLINARIS GELPI; su esposo de nombre desconocido FULANO DE TAL; LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA ENTRE ELLOS

Por la presente se les notifica que ha sido presentada en este Tribunal una Demanda en su contra en el pleito de epígrafe.

La abogada de la parte demandante es la **Lcda. Teresa Rosario Badillo, 1055 Avenida J.F. Kennedy, Suite 307, San Juan, P.R. 00920-1713; Tel. (787) 783-2711 / Fax (787) 783-2250.**

Se les advierte que este edicto se publicará en un (1) periódico de circulación general una (1) sola vez y que si no comparecen a contestar dicha Demanda radicando el original de la misma en el Tribunal Superior, Sala Superior de Humacao, con copia a la abogada de la parte demandante, dentro del término de treinta (30) días contados a partir de la publicación del edicto, se les anotará la Rebeldía y se dictará Sentencia en su contra concediendo el remedio solicitado en la Demanda sin más citarles ni oírles, disponiéndose además, que en los (10) días siguientes a la publicación de este edicto se les dirigirá por correo certificado con acuse de recibo una copia del Emplazamiento por Edicto y de la Demanda presentada a su última dirección postal conocida en **Condominio Monte Sol D-116, Fajardo, PR 00738.**

**EXPEDIDO** bajo mi forma y sello de este Tribunal, en Humacao, Puerto Rico, hoy día  JUN 1 2014  de 2014.



Dominga Gómez Fuster
Secretaria Regional
_____
Secretario

LUZ M. CARRO NAZARIO
Secretaria Auxiliar Tribunal
_____
Sub-Secretario

ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE PRIMERA INSTANCIA
SALA SUPERIOR DE HUMACAO

| | |
|---|---|
| ADA N. LÓPEZ SANTIAGO ; ÁNGEL LUIS RAMOS TORRES Y LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA ENTRE ELLOS<br><br>Demandantes<br><br>Vs.<br><br>DRA. YOLANDA MOLINARIS GELPI; su esposo de nombre desconocido FULANO DE TAL; LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA ENTRE ELLOS ; SU ASEGURADORA DE NOMBRE DESCONOCIDO X;CENTRO MEDICO DEL TURADO INC. H/N//C HOSPITAL HIMA SAN PABLO DE HUMACAO; SU ASEGURADORA DE NOMBRE DESCONOCIDO Z<br><br>Demandados | CIVIL NUM.<br><br>HSCI201400241 (208)<br><br><br>SOBRE:<br><br>DAÑOS Y PERJUICIO POR MALAPRÁCTICA MÉDICA |

## ORDEN

Vista la "Moción Solicitando Emplazamiento por Edicto", examinado el expediente y surgiendo de los autos que existe una reclamación que justifica la concesión del remedio solicitado, y que la parte demandada de epígrafe, es parte apropiada e indispensable en el pleito, el Tribunal la declara **Con Lugar** y, en su consecuencia, se prorroga el término concedido para emplazar a la parte demandada de epígrafe a tenor con la Regla 68.2 de las de Procedimiento Civil (32 L.P.R.A. Ap. V, R. 68.2) y se ordena además el emplazamiento de la parte demandada de epígrafe conforme a la Regla 4.6 de las de Procedimiento Civil (32 L.P.R.A., Ap. V, R. 4.6), mediante la publicación de (1) solo edicto en un (1) periódico de circulación general diaria en Puerto Rico, a los efectos de que se presente cualquier oposición a la Demanda dentro del término de treinta (30) días contados a partir de la publicación del edicto, apercibiéndoseles que de no hacerlo se les anotará la rebeldía y se dictará sentencia en su contra concediendo el remedio solicitado en la Demanda sin más citarles ni oírles; disponiéndose que los diez (10) días siguientes a la publicación del edicto se les dirigirá a la parte demandada de epígrafe, por correo certificado con acuse de recibo copia del Emplazamiento por Edicto y de la Demanda presentada a su última dirección postal conocida en **Condominio Monte Sol D-116, Fajardo, PR 00738.**

Se ordena a la Secretaría expida el correspondiente Edicto.

En San Juan, Puerto Rico, hoy 4 de junio de 2014.


**JUEZ SUPERIOR**
RUBEN CASTRO RODRIGUEZ
JUEZ SUPERIOR

ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE PRIMERA INSTANCIA
SALA SUPERIOR DE CAGUAS

| | |
|---|---|
| ADA N. LÓPEZ SANTIAGO ; ÁNGEL LUIS RAMOS TORRES Y LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA ENTRE ELLOS<br><br>Demandantes<br><br>Vs.<br><br>DRA. YOLANDA MOLINARIS GELPI; su esposo de nombre desconocido FULANO DE TAL; LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA ENTRE ELLOS ; SU ASEGURADORA DE NOMBRE DESCONOCIDO X;CENTRO MEDICO DEL TURADO INC. H/N//C HOSPITAL HIMA SAN PABLO DE HUMACAO; SU ASEGURADORA DE NOMBRE DESCONOCIDO Z<br><br>Demandados | CIVIL NUM. EDP2014-0053<br><br>SALA 403 A<br><br>SOBRE:<br><br>DAÑOS Y PERJUICIO POR MALAPRÁCTICA MÉDICA<br><br> |

## DEMANDA

**AL HONORABLE TRIBUNAL:**

Comparecen las partes demandantes Ada N. López Santiago, Ángel Luis Ramos Torres y la sociedad Legal de Gananciales compuesta entre ellos por conducto de la representación legal que suscribe y muy respetuosamente **EXPONEN, ALEGAN y SOLICITAN:**

1. La demandante Ada N. López Santiago, es mayor de edad, casada, y vecina de Caguas , PR. Su dirección, física y postal es: Número 100 Avenida Espíritu Santo Apto. 8-203, Caguas, PR 00725. Su teléfono es el (787) 344-3823.

2. El demandante Ángel Luis Ramos Torres, es mayor de edad, casado con Ada N López Santiago y vecino de Caguas, P.R. Su dirección, física y postal es : Numero 100 Avenida Espíritu Santo Apto. 8-203, Caguas, PR 00725.

3. El demandado CENTRO MEDICO DEL TURADO INC. H/N//C HOSPITAL HIMA SAN PABLO DE HUMACAO es una corporación debidamente organizada y autorizada para proveer servicios Médicos Hospitalarios en el Estado Libre Asociado de Puerto Rico. **La dirección física de sus oficinas principales en las que se encuentra su Agente Residente es la siguiente: Avenida Luis**

**Muñoz Rivera # 100, Caguas, Puerto Rico 00725.** Su dirección postal es el PO BOX 4980, **Caguas**, Puerto Rico, 00726.

4. Que por información y conocimiento, la demandada Dra. Yolanda Molinaris Gelpi es un médico autorizado a ejercer la práctica de la Medicina en el Estado Libre Asociado de Puerto Rico quien a su vez es empleada y/o contratista de la corporación Centro Médico del Turabo Inc., y posee privilegios para ofrecer servicios médicos en el Hospital HIMA San Pablo de Humacao, Puerto Rico. Su dirección física es: Condominio Monte Sol D-116, Fajardo, PR 00738. Su dirección postal es: PO BOX 834, Fardo, P.R. 00738-0834.

5. El Sr. Fulano de Tal es el esposo de nombre desconocido de la Dra. Yolanda Molinaris Gelpi con quien tiene compuesta una sociedad legal de gananciales. La sociedad legal de gananciales compuesta por ellos se beneficia del producto del trabajo de la Dra. Yolanda Molinaris Gelpi en el Hospital HIMA San Pablo Humacao. Su dirección física es: Condominio Monte Sol D-116, Fajardo, PR 00738. Su dirección postal es: PO BOX 834, Fardo, P.R. 00738-0834.

6. La aseguradora de nombre desconocido X es la compañía que a la fecha de los hechos tenía sendas pólizas de seguros que cubren los hechos reclamados en la presente Demanda expedidas a favor de la Dra. Yolanda Molinaris Gelpi.

7. La aseguradora de nombre desconocido Z es la compañía que a la fecha de los hechos tenía sendas pólizas de seguros que cubren los hechos reclamados en la presente Demanda expedidas a favor de CENTRO MEDICO DEL TURADO INC. H/N//C HOSPITAL HIMA SAN PABLO DE HUMACAO.

## HECHOS

8. Ada N. López Santiago, de 34 años de edad estaba embarazada de su primer hijo a la fecha de los hechos objeto de ésta demanda, al que esperaba con muchísima ilusión. La ginecóloga/obstetra encargada de su tratamiento y cuidado prenatal lo era la Dra. Yolanda Molinaris Gelpi.

9. El 21 de febrero de 2013 y alrededor de las 10:45 am, la Sra. López acudió a su última visita prenatal en la oficina de la Dra. Molinaris. Se documentó en el

2

expediente que la queja principal de la paciente era dolor fuerte. Se documentó una presión arterial de 120/90 y un examen pélvico que demostró dilatación de 3 cm y borramiento de 40%. **No se documentó en el expediente que se haya evaluado la orina de la paciente para la presencia de proteína ni comentario o recomendación alguna sobre la presión arterial elevada que se le identificó a la paciente. La paciente fue enviada a su casa.**

10. El referido día 21 de febrero de 2013, alrededor de las **5 pm, la Sra. Ada López identificó contracciones dolorosas cada 5 minutos por lo que acudió al Hospital Hima de Humacao para ser evaluada.** El expediente clínico de la sala de emergencia del Hospital Hima San Pablo de Humacao refleja que la paciente fue evaluada el 21 de febrero de 2013 a las 6:45 pm quejándose de contracciones cada 5 minutos y presentando una **presión arterial alta.** El examen pélvico reveló una dilatación de 5 cm por lo que fue admitida al servicio de la Dra. Molinaris en sala de partos alrededor de las 7 pm. El estimado inicial en sala de partos por el personal de enfermería **mostró una presión arterial alta y documentó una rotura de membranas amnióticas a las 8 pm.**

11. A las **9 pm del 21 de febrero de 2013**, la paciente fue evaluada inicialmente por la Dra. Molinaris quien la encontró en 5 cm de dilatación y quien **ordenó se le desconectara el monitor fetal y se le permitiera a la paciente ambular por el pasillo.** Una nota de progreso escrita por la Dra. Molinaris a las 9:00 pm describe un embarazo de 39 6/7 semanas en trabajo de parto y con dilatación de 5 cm. Aunque la paciente fue evaluada en sala de emergencias alrededor de las 6:45 pm con una presión arterial alta y al llegar a sala de partos continuaba presentando presión arterial alta, la Dra. Molinaris describió eso como signos vitales estables.

12. A la **10 pm, las notas de enfermería describen que se le colocó el monitor fetal** y se observaron latidos fetales de 152/min y contracciones fuertes. A las **10:45 pm,** se describen latidos de 139/min y dilatación de 7 cm según la Dra. Molinaris. A las **11 pm, se identifica nuevamente que la**

paciente tiene una presión arterial alta de 140/90 la cual se notificó a la Dra. Molinaris.

13. No es sino hasta las **12 de la media noche,** que la Dra. Molinaris vuelve a evaluar a la paciente y la encontró en 10 cm de dilatación. A la 1 am del 22 de febrero de 2013, se describe a la paciente pujando y unos latidos fetales entre 118 y 138. A las 2 am, se comenzó a la paciente en pitocina. Se describe un latido fetal de 147. A las 2:45 am, la Dra. Molinaris evaluó a la paciente y refirió que el bebé todavía no baja. **A las 3 am,** la Dra. Molinaris orienta a la paciente y **le toma permiso operatorio para una cesárea.**

14. A las 3:10 am, la Dra. Molinaris escribe una nota de progreso pre-operatoria en la que describe que la paciente fue admitida de parto activo, que progresó adecuadamente en dilatación mostrando un latido fetal reactivo durante monitoreo fetal intermitente según solicitado por la paciente. Sin embargo la Sra. López **no solicitó el alegado monitoreo intermitente en ningún momento.** La Dra. Molinaris continuó documentando en esa nota de progreso que el latido cardiaco fetal fluctuó entre 118 y 139, **pero no describe si ocurrió algún patrón de desceleraciones en el latido ni la variabilidad del mismo.** La doctora describe que el latido cardiaco fetal se mantuvo con parámetros normales y sin bradicardia ni taquicardia. Sin embargo **ni ésta, ni el Hospital Hima San Pablo de Humacao nos han provisto hasta el presente evidencia de los trazados fetales que han sido solicitados por la Sra. López en numerosas ocasiones.** En vista de esos hallazgos descritos por la Dra. Molinaris, ella le recomendó una cesárea a la paciente.

15. A las **3:30 am, se documenta** en las notas de enfermería **que ya se notificó al personal de sala de operaciones.** A las 3:35 pm, se descontinúa la pitocina. A **las 4 am,** se documenta estar pendientes para subir a la paciente a sala de operaciones y **le desconectan el monitor fetal a la paciente.**

16. El documento identificado como Estimado y Plan de Cuidado-Sala de operaciones señala que la paciente entró a sala de operaciones a las 4:50 am del 22 de febrero de 2013 y que la anestesia comenzó a las 5:00 am. La cirugía

4

comenzó a las 5:22 am y terminó a las **6:15 am**. El reporte de la cesárea describe el nacimiento de un bebé varón a las 5:30 am del 22 de febrero de 2013 con Apgar de 2 al minuto de nacido y 2 a los 5 minutos de nacido. Al nacer, **el bebé fue entubado y trasladado al área de nursery. Los signos vitales de la paciente después de la cesárea eran de una presión arterial de 90/60 y un pulso de 120.**

17. Una nota de progreso escrita por la Dra. Molinaris el 22 de febrero de 2013 a las 6:20 am se documenta en el expediente como una Nota Post-Operatoria. En esa nota, la doctora describe la ocurrencia de una laceración en el segmento uterino inferior la cual fue reparada. Sin embargo, en esa misma nota la doctora refiere que no hubo ninguna complicación y que la pérdida estimada de sangre fue de 800 ml.

18. La Sra. López fue transferida fuera de sala de operaciones y ubicada en la habitación 228 alrededor de las **8:00 am** del 22 de febrero de 2013. La descripción de la enfermera que la recibió es **que la paciente se veía pálida y con sangrado profuso. Sus signos vitales presentaban un pulso y una presión arterial peligrosamente bajas.** Se notificó a la Dra. Molinaris quien evaluó a la paciente y verbalizó que la llevaría a sala de operaciones. A las **9:20 am**, la enfermera describe que la paciente presentaba una presión arterial de 78/58 la **cual no se escuchaba mucho.** No es sino hasta las **9:45 am**, que la paciente es llevada nuevamente a sala de operaciones. El expediente de anestesia refleja que la anestesia comenzó a las 10:05 am del 22 de febrero de 2013. **La cirugía comenzó a las 10:25 am y término a las 12:15 pm.** Se estimó una pérdida de sangre de 3,000 ml **(3 litros)**.

19. El reporte de la operación documentado por la Dra. Molinaris describe un **área de la laceración ocurrida y reparada durante la cesárea que todavía continuaba sangrando y la presencia de atonia uterina.** La doctora procedió a reparar la laceración del cuello uterino, ligar las arterias uterinas y ováricas y colocar una sutura B-Lynch en el útero. Una nota pos-operatoria escrita por la Dra. Molinaris a las 12:40 pm documenta **los diagnósticos post-**

operatorios de hemorragia post-parto, laceración del cuello uterino, shock hemorrágico y fallo respiratorio. La paciente fue transferida al área de recuperación y de ahí a la unidad de intensivo donde permaneció entubada y en ventilación mecánica durante varios días.

20. El bebé de la Sra. Ada López Santiago fue admitido al área de recién nacidos del Hospital Hima- San Pablo de Humacao el 22 de febrero de 2013. El bebé llegó al nursery a las 6:40 am **presentando complicaciones de Apgar 2/2, sin esfuerzo respiratorio y con presencia de meconio al succionarlo al momento de nacer. Al nacer, el bebé presentó cianosis, bradicardia, hipotonía y retracciones intercostales** lo cual requirió que fuese entubado. Al examen físico se describe al bebé sin llanto, con un caput marcado y con arresto respiratorio al momento de nacer. Fue transferido al Hospital Pediátrico Universitario del Centro Médico de Río Piedras para beneficiarlo ante su cuadro clínico del procedimiento de "Brain-cooling"

21. El bebé de la Sra. Ada López Santiago fue admitido al Hospital Pediátrico Universitario Dr. Antonio Ortiz el 22 de febrero de 2013 y dado de alta el 8 de marzo de 2013. Su diagnóstico principal fue el de depresión neonatal además de pulmonía por aspiración, convulsiones, pneumotorax y efusión pericárdica. Durante su estadía en el hospital el bebé requirió los procedimientos de: "brain-cooling", ventilación mecánica, nutrición parenteral total y pericardiocentesis. Al momento de alta, se le recomendó continuar en Luminal como anticonvulsivante y seguimiento en las clínicas de neurología, alto riesgo, genética y cardiología pediátrica. Su pronóstico se describió como indeterminado.

22. Luego de haber sido dado de alta, el bebé Dominick Ramos López ha tomado numerosas terapias ocupacionales y ha tenido que acudir a numerosas visitas con sub-especialidades pediátricas tales como: neumología, neurología, cardiología, patología del habla, audiólogia, geneticista, fisiatría, neonatología, psicología y oftalmología. Estos a su vez le han efectuado múltiples estudios, sin embargo, su pronóstico a largo plazo se considera al presente como uno incierto.

6

## NEGLIGENCIA Y RELACION CAUSAL

23. Todos los aquí co-demandados: DRA. YOLANDA MOLINARIS GELPI; su esposo de nombre desconocido FULANO DE TAL; LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA ENTRE ELLOS ; SU ASEGURADORA DE NOMBRE DESCONOCIDO X;CENTRO MEDICO DEL TURADO INC. H/N//C HOSPITAL HIMA SAN PABLO DE HUMACAO; SU ASEGURADORA DE NOMBRE DESCONOCIDO Z responden solidaria y mancomunadamente por los actos negligentes ejecutados por ellos y/o por sus empleados y/o contratistas y/o personal médico y/o de enfermería y/o paramédico y/o técnico y/o los anestesiólogos que estuvieron envueltos en el tratamiento negligente y alejado de las mejores normas y prácticas de la profesión médica que se le brindó a Ada N. López Santiago.

24. El cuidado médico ofrecido a la paciente Ada N. López Santiago durante su cuidado prenatal y su parto por la Dra. Yolanda Molinaris **se apartó de las normas básicas de excelencia que la medicina requiere en numerosos aspectos.** En su última visita prenatal, el 21 de febrero de 2013, se documentó una presión arterial de 120/90 **sugestivo de hipertensión gestacional en la paciente**, ante lo cual la **Dra. Molinaris no hizo mención ni tomo medida alguna.** Una paciente con ese cuadro clínico, **debió ser hospitalizada de inmediato.**

25. Ese mismo día, 21 de febrero de 2013, la Sra. López acudió a la sala de emergencia del Hospital Hima de Humacao en trabajo activo de parto donde se le identificó una presión arterial de 117/116. La paciente fue admitida a sala de partos al servicio de la Dra. Molinaris donde se documentó, a las 8:00 pm, una presión arterial de 140/90 y rotura espontánea de membranas amnióticas. El esposo de la paciente **describe el líquido amniótico como verdoso.** La Dra. Molinaris **evaluó a la paciente alrededor de las 9:00 pm sin documentar en el expediente la elevación en presión arterial ni la presencia de meconio en el líquido amniótico. La doctora se limitó a describir estos signos vitales como estables y ordenó se le desconectara el monitor fetal a la paciente para que ambulara por el pasillo, sin describir ni**

comentar sobre las características del latido cardiaco fetal. A las 10:00 pm, las notas de enfermería describen que se colocó el monitoreo fetal observándose latidos de 152 por minuto y contracciones fuertes. **Esta es la primera documentación en el expediente de sala de partos que tenemos del latido cardiaco fetal del bebé de la Sra. López ya que el trazado del monitor electrónico fetal que el expediente refiere se utilizó no nos ha sido provisto por el hospital.** A las 10:45 pm, se describen latidos de 139/ min **sin describir variabilidad ni presencia de desaceleraciones.** A las 11:00 pm, se identifica una presión arterial de 140/90 la cual se notifica a la Dra. Molinaris **sin que la doctora haga una mención de la misma en el expediente.** A las 12:00 de la media noche, la Dra. Molinaris evalúa a la paciente y la encuentra en 10 centímetros de dilatación. A la 1:00 am del 22 de febrero de 2013, se describe en las notas de enfermería a la paciente pujando y con latidos fetales entre 118 y 138. **No se describe, ni por el personal de enfermería, ni por la Dra. Molinaris, las características de variabilidad del latido cardiaco fetal, ni la presencia o ausencia de desceleraciones del latido cardiaco fetal.** A las **2:00 am, se comienza la paciente en pitocina y se describe un latido fetal de 147** según las notas de enfermería, **sin describir variabilidad ni presencia o ausencia de desaceleraciones fetales.**

26. El Boletín de Práctica Número 70 (diciembre 2005) del Colegio Americano de Obstetras y Ginecólogos (ACOG) establece que se debe evaluar y documentar en el expediente el latido cardiaco fetal cada 15 minutos durante la fase activa de la primera etapa del parto (de 4 a 10 centímetros) y por lo menos cada 5 minutos en la segunda fase del parto (desde los 10 centímetros hasta el alumbramiento). Concluye el boletín que el parto en mujeres con condiciones de alto riesgo debe ser monitoreado continuamente.

27. A su vez el Boletín de Práctica Número 106 (julio 2009) del ACOG establece que si el monitoreo fetal electrónico se utiliza durante el parto, la enfermera o el médico a cargo de la paciente **debe revisarlo frecuentemente.** En una

8

paciente **sin complicaciones,** el latido cardiaco fetal debe ser evaluado aproximadamente **cada 30 minutos en la primera etapa del parto y cada 15 minutos durante la segunda etapa.** La frecuencia correspondiente en **pacientes con complicaciones** tales como restricción en crecimiento fetal y preeclampsia **es de aproximadamente cada 15 minutos en la primera etapa del parto y cada 5 minutos durante la segunda etapa. Los proveedores de cuidado de salud deben documentar periódicamente que han repasado el trazado. El trazado del monitor fetal es parte del expediente médico y debe ser rotulado adecuadamente y estar disponible para revisión futura en caso.**

28. A las 3:00 am, la Dra. Molinaris orienta a la paciente sobre la necesidad de una cesárea y le toma el permiso operatorio para la misma. A las 3:10 am, la Dra. Molinaris describe en una nota de progreso que la paciente había solicitado monitoreo fetal intermitente. **La Sra. López en ningún momento solicitó este tipo de monitoreo y de haber sido así le correspondía a la Dra. Molinaris implementar las recomendaciones de monitoreo fetal intraparto contenidas en los boletines de práctica del ACOG. El monitoreo fetal ofrecido a la Sra. López hasta ese momento fue totalmente inadecuado y apartado de las normas de la práctica médica de excelencia.**

29. A partir de las 3:00 am cuando la Dra. Molinaris decidió recomendarle una cesárea a la paciente y obtuvo el permiso operatorio, **no fue hasta las 5:30 am** cuando finalmente nació el bebé de la Sra. López en condición crítica y con Apgar de 2/2. **En las notas de progreso de enfermería se documenta a las 4:00 am que a la paciente se le desconectó el monitor fetal. No se encontró evidencia en el expediente médico de que se haya evaluado el latido cardiaco fetal en los 90 min previos al nacimiento del bebé. Esto, en total desacuerdo con las recomendaciones de los Boletines emitidos por el** Colegio Americano de Obstetras y Ginecólogos (ACOG).

30. La tardanza en ejecutar la cesárea desde que se tomó la decisión y se obtuvo el permiso operatorio (aproximadamente **2 horas y 30 min**) tuvieron un efecto causal directo en la condición crítica en que nació el bebé. Es responsabilidad de un hospital donde se realizan partos el tener las facilidades, tanto de enfermería como de anestesia para realizar una cesárea en no más de **30 a 60 min** desde el momento en que se determina. La responsabilidad de la doctora en este caso es compartida con el hospital y con el departamento de anestesia.

31. La cesárea de la Sra. Ada López comenzó a las 5:22 am del 22 de febrero de 2013. Los signos vitales de la paciente después de la cesárea eran de una presión arterial de 90/60 y un pulso de 120 por min. En la nota de progreso post-operatoria escrita por la Dra. Molinaris a las 6:20 am, la doctora **describe la ocurrencia de una laceración en el segmento uterino inferior la cual fue reparada. Sin embargo, en esa misma nota, la doctora refiere que no hubo ninguna complicación.** La Sra. López fue transferida fuera de sala de operaciones y ubicada en la habitación 228 alrededor de las **8:00 am del 22 de febrero de 2013.** La enfermera que la recibió describe a la paciente como **pálida y con sangrado profuso.** Se notificó a la Dra. Molinaris quien verbalizó que la llevaría a sala de operaciones. A las 9:20 am, la enfermera describe que la paciente presentaba una presión arterial de 78/58 la cual **no se escuchaba mucho.** A las **9:47 am,** la paciente llegó a sala de operaciones con una presión arterial de 90/31 y un pulso de 121. **La cirugía comenzó a las 10:25 am y terminó a las 12:15 pm estimándose una pérdida de sangre de 3,000 ml (3 litros).** El reporte de la operación documentado por la Dra. Molinaris describe un área de la laceración ocurrida y reparada durante la cesárea que todavía continuaba sangrando. La doctora procedió a reparar la laceración. Los diagnósticos post-operatorios documentados por la Dra. Molinaris fueron hemorragia post-parto, laceración del cuello uterino, shock hemorrágico y fallo respiratorio. La paciente requirió permanecer en la unidad de cuidado intensivo entubada y en ventilación mecánica. Su curso post-operatorio requirió múltiples transfusiones de sangre, crioprecipitado y plasma.

10

32. La Dra. Molinaris se apartó de las normas de excelencia de la práctica médica **al no solicitar la ayuda de un asistente que mediante un examen pélvico durante la cesárea ayudara a elevar la parte presentante del bebé, en este caso la cabeza, fuera del canal vaginal y así reducir la posibilidad de una laceración del cuello uterino.**

33. La Dra. Molinaris **fallo al no reparar adecuadamente la laceración del cuello uterino que ella refiere haber identificado durante la cesárea.**

34. El atraso con que la Dra. Molinaris intervino para realizar la cirugía exploratoria en una paciente con sangramiento profuso, hipotensa y taquicárdica desde que la evaluó a las 8:00 am hasta que comenzó la cirugía a las 10:25 am (2 horas y 25 min) contribuyó enormemente al estado crítico y a las complicaciones de la paciente durante y después de la cirugía exploratoria.

35. La condición crítica en que nació el bebe de la paciente Ada N. López guarda relación directa con las desviaciones en el monitoreo fetal que la práctica de excelencia de la medicina requiere durante el proceso del parto. A ésto también contribuyó la tardanza de más de 2 horas en realizar la cesárea a la paciente una vez decidido el procedimiento y obtenido el consentimiento informado para el mismo. La prontitud con que se realiza la cesárea es responsabilidad combinada entre las funciones de su médico de cabecera (Dra. Molinaris), el personal de enfermería de sala de partos y sala de operaciones del Hospital Hima San Pablo y el personal de anestesia del mismo hospital.

36. La condición crítica que presentó la Sra. López luego de la cesárea fue resultado de no haber tomado las medidas preventivas para reducir el riesgo de una laceración cervical durante una cesárea, de no reparar adecuadamente la laceración cervical que se identificó y de la tardanza en intervenir quirúrgicamente por segunda vez a la Sra. López lo cual provocó que ésta llegase a sala de operaciones en estado de shock. Esta responsabilidad recae sobre la Dra. Molinaris.

37. Los Médicos y el Hospital co- demandado, así como sus empleados y/o contratistas y/o personal médico y/o de enfermería y su anestesiólogos se

apartaron de las normas mínimas de conocimiento y cuidado aplicables a la práctica de la medicina. Estos incumplieron con su deber de ofrecerles a sus pacientes la atención que satisfaga las exigencias generalmente reconocidas por la profesión médica a la luz de los medios modernos de comunicación y se apartaron de la práctica de excelencia que rige la medicina.

En su relación externa frente al paciente, el hospital es responsable por los actos negligentes de su facultad médica, de sus anestesiólogos, y del personal de apoyo, tal como las enfermeras. Las enfermeras no ejercieron el grado de cuidado razonable ejercitado por otras enfermeras en localidades similares para evitar causarle daño innecesario a la paciente.

Las enfermeras de la sala de parto no identificaron las deceleraciones del feto, la taquicardia, la pérdida de variabilidad ni la bradicardia que debio haber reflejado el monitor fetal de la señora López. Estas tampoco le informaron a la Dra. Molinaris sobre las deceleraciones y la taquicardia que sufrió el feto. Además, en multiples ocasiones las enfermeras le quitaron a la Sra. López el monitor fetal. Por lo tanto, no hay trazados fetales en lapsos excesivamente prolongados de tiempo durante el parto de la Sra. López. Cualquier condición que le ocurriera al feto en esos intervalos de tiempo no está contenida en un trazado fetal. Sin embargo, el récord de la señora Ortiz no contiene anotaciones de monitoreo fetal por periodos prolongados de tiempo. Las enfermeras no monitorearon a la señora López con la frecuencia requerida y dejaron de detectar los síntomas de la angustia fetal. La negligencia de las enfermeras contribuyó al empeoramiento de la condición del feto y la condición de la Sra. López. Por lo tanto, los actos o las omisiones del personal de la sala de parto antes de nacer el menor contribuyeron a los daños físicos experimentados por la Sra. López y a las condiciones que le aquejarán toda su vida al menor y que le han causado tantos daños y angustias a sus padres.

38. El CENTRO MEDICO DEL TURADO INC. H/N//C HOSPITAL HIMA SAN PABLO DE HUMACAO; incurrió en negligencia in eligiendo al contratar a una persona de cuestionable capacidad para proveer servicios médicos en su institución.

12

39. Las partes demandantes se reservan el derecho de enmendar las alegaciones, durante el transcurso de los procedimientos, según sea necesario.

40. Los actos y omisiones de todos los aquí codemandados causaron a los demandantes los daños físicos y los intensos sufrimientos mentales que aquí se describen por lo que responden mancomunada y solidariamente ante éstos.

41. De igual manera, la Sociedad Legal de Gananciales compuesta por la Dra. Molinaris con su esposo de nombre desconocido, al beneficiarse de la labor realizada por la primera, responden solidaria y mancomunadamente ante los demandantes.

42. Las ASEGURADORA DE NOMBRE DESCONOCIDO X y Z responden solidaria y mancomunadamente ante los demandantes.

## DAÑOS

43. Como resultado próximo de los actos y omisiones de los aquí demandados, la co-demandante Ada López Santiago experimentó serios daños físicos y angustias mentales. Esta sufre y continuará sufriendo, intensas angustias mentales y emocionales por los serios daños experimentados por su hijo cuyo diagnostico, a pesar de que está cercano a cumplir un año de vida es incierto, además de cuantiosos gastos médicos.

44. Los daños físicos de la codemandante Ada N. López consisten en, sin limitarse a los siguientes: a. hemorragia post-parto b. laceración del tracto genital. c. Laceración del segmento uterino inferior que se extendía hasta el cervix uterino, d. hipotensa y taquicárdia, por lo que se decidió someterla a una exploratoria para detener la hemorragia. e. Se estimó una pérdida de sangre de 3,000 ml (3 litros). f. La hemoglobina intraoperatoria fue de 5.8 gms. g. El reporte de la operación documentado por la Dra. Molinaris describe un área de la laceración ocurrida y reparada durante la cesárea que todavía continuaba sangrando y la presencia de atonía uterina. h. Reparación de laceración del cuello uterino, ligar las arterias uterinas y ováricas y colocar una sutura B-Lynch en el útero. i. **shock hemorrágico** j. **fallo respiratorio.** k.

La paciente fue transferida al área de recuperación y de ahí a la **unidad de intensivo donde permaneció entubada y en ventilación mecánica por varios días.**

l. El curso post-operatorio de la Sra. Ada López Santiago requirió de múltiples transfusiones de sangre (6 unidades), crioprecipitado (10 unidades) y plasma (6 unidades), además de evaluaciones por neumología, hematología y medicina interna. m. La Sra. López fue dada de alta el 26 de febrero de 2013 con diagnósticos de: hemorragia post-parto, shock hemorrágico, laceración del cuello uterino, fallo respiratorio y anemia. La paciente requirió admisión a la unidad de intensivo, transfusiones y ventilación mecánica. o. El examen físico de la paciente en esa primera visita post-parto reveló eritema y secreciones en el área de la herida de la cesárea. La impresión diagnóstica fue de infección de la herida. Se le recomendó Vancomicina 500 mg por vía oral cada 6 horas por 7 días.

p. El 7 de marzo de 2013, la Sra. López volvió a la oficina de la Dra. Molinaris refiriendo no haber conseguido el antibiótico Vancomicina. Debido a éso, se le cambió el antibiótico a Cipro para el tratamiento de la infección de la herida. El 11 de marzo de 2013, la Sra. López volvió a la oficina de la Dra. Molinaris con un sonograma del área de la herida de la cesárea que reflejaba una colección de fluído de 2.6 cm.

q. El bebé de la Sra. Ada López Santiago fue admitido al área de recién nacidos del Hospital Hima-San Pablo de Humacao el 22 de febrero de 2013. En el expediente del nursery se documenta en una nota de asistencia al parto y de admisión (Delivery Attendance/Admission Note) que el bebé llegó al nursery a las 6:40 am presentando complicaciones de Apgar 2/2, sin esfuerzo respiratorio y con presencia de meconio al succionarlo al momento de nacer. Al nacer, el bebé presentó cianosis, bradicardia, hipotonía y retracciones intercostales lo cual requirió que fuese entubado. Al examen físico se describe al bebé sin llanto, con un caput marcado y con arresto respiratorio al momento de nacer. En el resumen de alta para ser transferido al Hospital

Pediátrico Universitario del Centro Médico de Río Piedras se incluyen como diagnósticos finales los siguientes: bebé a término adecuado para edad gestacional (TAGA), depresión neonatal, Apgar bajo, acidosis metabólica y sospecha de anoxia. Se decidió transferir al bebé para beneficiarlo ante su cuadro clínico del procedimiento de "Brain-cooling"

r. El bebé de la Sra. Ada López Santiago fue admitido al Hospital Pediátrico Universitario Dr. Antonio Ortiz el 22 de febrero de 2013 y dado de alta el 8 de marzo de 2013. Su diagnóstico principal fue el de depresión neonatal además de pulmonía por aspiración, convulsiones, pneumotorax y efusión pericárdica. Durante su estadía en el hospital el bebé requirió los procedimientos de: "brain-cooling", ventilación mecánica, nutrición parenteral total y pericardiocentesis. Al momento de alta, se le recomendó continuar en Luminal como anticonvulsivante y seguimiento en las clínicas de neurología, alto riesgo, genética y cardiología pediátrica. Su pronóstico se describió como indeterminado.

s. Luego de haber sido dado de alta, el bebé Dominick Ramos López ha necesitado múltiples visitas con sub-especialidades pediátricas tales como: neumología, neurología, cardiología, patología del habla, audiólogia, geneticista, fisiatría, neonatología, psicología y oftalmología. Su pronóstico a largo plazo se considera al presente como uno incierto.

45. Por los daños físicos experimentados por la co-demandante Ada N. López Santiago ésta reclama la cantidad de **OCHOCIENTOS MIL DOLARES ($800,000)**. Dicha demandante tiene derecho a que los aquí demandados la compensen, solidaria y mancomunadamente, por las cantidades aquí reclamadas.

46. Los intensos daños mentales y emocionales de la co-demandante Ada N. López por las condiciones experimentadas por ésta así como las intensas angustias y sufrimientos mentales que experimenta y continuará experimentando por las condiciones y padecimientos de su único hijo a causa de las actuaciones constitutivas de Mala práctica médica se valoran en la

cantidad de **Dos Millones de dólares ($2,000,000).** Dicha demandante tiene derecho a que los aquí demandados le paguen, solidaria y mancomunadamente, la suma antes descrita como compensación por los daños mentales y emocionales experimentados y que continua y continuara experimentando la co- demandante.

47. Los demandantes, ADA N. LÓPEZ SANTIAGO y ÁNGEL LUIS RAMOS TORRES han incurrido y continuaran incurriendo en gastos médicos y costas para el tratamiento médico de los daños antes descritos. Los demandantes tienen derecho a recuperar solidaria y mancomunadamente, de los demandados dichos gastos médicos y costas, por las **cantidades que se establezcan en su debido momento en Corte.**

48. Como consecuencia próxima de los actos y omisiones de los demandados, de los daños físicos y emocionales de su esposa madre y los severos daños físicos experimentados por su único hijo Dominike Ramos el co -demandante ÁNGEL LUIS RAMOS TORRES ha sufrido y continuará sufriendo intensos daños emocionales y mentales los cuales se valoran en la cantidad de **Dos Millones de dólares ($2,000,000).** Dicho demandante tiene derecho a que los aquí demandados le paguen, solidaria y mancomunadamente, la suma antes descrita como compensación por los daños mentales y emocionales experimentados y que continuará experimentando.

    **POR TODO LO CUAL,** se solicita que luego de los trámites de rigor correspondientes se declare Con Lugar la presente demanda y se condene Solidariamente a las partes demandadas al pago de las sumas antes reclamadas, costas, gastos y una suma razonable por concepto de honorarios de abogado.

**RESPETUOSAMENTE SOMETIDO.**

En San Juan, Puerto Rico, hoy 20 de febrero de 2014.

16

  

*/s/ TR Badillo*

**TERESA ROSARIO BADILLO**
NUM. RUA 9584
EDIF. ILA, SUITE 307
AVE. KENNEDY #1055
SAN JUAN, PUERTO RICO 00920-1713
TEL. 787-783-2711
FAX. 787-783-2250
trosariobadillo@yahoo.com